59 F.Supp.2d 1243 (1999)
Jane PARENT, individually and on behalf of and as next friend for the minor child, John STUDENT, Plaintiffs,
v.
OSCEOLA COUNTY SCHOOL BOARD, Penny Collins, and Charles Paradiso, Defendants.
No. 98-989-CIV-ORL-18B.
United States District Court, M.D. Florida, Orlando Division.
June 21, 1999.
*1244 *1245 Peter Prescott Sleasman, Jodi Lynn Siegel, Robert Hornstein, Southern Legal Counsel, Inc., Gainesville, FL, for Jane Parent, individually, and on behalf of and as next friend for the minor child, John Student, plaintiff.
Usher L. Brown, Brown & Van Leuven, P.A., Orlando, FL, for Osceola County School Board, Penny Collins, Charles Paradiso, defendants.
Helene S. Mayton, Florida Department of Education, Tallahassee, FL, for Frank Brogan, in his official capacity as Commissioner of Education, defendant.

*1246 ORDER
G. KENDALL SHARP, District Judge.
Jane Parent, individually and on behalf of John Student, brings this action against the Osceola County School Board (OCSB), Osceola High School Principal Charles Paradiso, and the OCSB's Director of Exceptional Student Education Penny Collins claiming that the plaintiffs' rights were violated under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1491o, and the Fourteenth Amendment of the Constitution. The gravamen of the plaintiffs' complaint is that the defendants failed to provide the plaintiffs with certain procedural safeguards and did not afford Student adequate educational benefits in the least restrictive environment when the defendants placed Student in the OCSB's Alternative School after Student slashed another student with a box cutter.
This case is presently before the court upon (1) Paradiso and Collins' motion for summary judgment (doc. 24) on counts 4 and 5 of the amended complaint and (2) Paradiso, Collins, and the OCSB's motion for summary judgment (doc. 48) on the entire action. The plaintiffs have responded in opposition to both motions. After reviewing the parties' arguments, the record, and the applicable law, the court concludes that summary judgment is warranted.

I. Background
John Student, Jane Parent's son, is an emotionally handicapped and learning disabled child with a history of behavioral problems. During 1995 and 1996, Student attended Osceola High School (OHS) for the ninth grade and for the first part of the tenth grade. While attending OHS, Student received numerous disciplinary sanctions for fighting, disobedience, profanity, and other maladaptive behavior. (Tr. Hr'g 3/31/98 at 35-36, Admin.R.; Summ. of Discipline, Admin.R., Ex. 4.)
On October 1, 1996, Student became involved in an altercation with another student while on a school bus. (Aff. Paradiso ¶ 3, Doc. 24, Ex. 1.) During the fight, Student slashed the other student's face with a box cutter. (Id.) As a result of the incident, Student was placed in a juvenile detention center and was suspended from school. (Id.)
On October 7, 1996, a staffing committee conducted a manifestation hearing to determine whether Student's conduct was a manifestation of his disability. (Aff. Paradiso ¶ 7, Doc. 24, Ex. 1.) If the committee decided that the incident was not a manifestation of his disability, then Student could be expelled from school. (OCSB Rule 7.5.2, Admin.R., Ex. 29.) Otherwise, Student could not be expelled from school, but his individualized education program (IEP) could be revised. (Id.) An IEP is a written statement prepared and periodically reviewed for each handicapped child that, among other things, sets forth the child's present levels of educational performance and establishes measurable annual goals for meeting the child's educational needs. See 20 U.S.C. § 1414(1)(A).
At the October 7, 1996 manifestation hearing, Charles Paradiso, OHS's principal, recommended Student's expulsion from school for the remainder of the 1996-1997 school year and also the 1997-1998 school year. (10/7/96 Addendum to IEP, Admin.R., Ex. 5.) In response, Parent asked the committee to make an inquiry into what the other boys on the bus were doing to Student. (Id.) Parent contends that the "committee cut me off and told me that it didn't make a difference because Paradiso had already recommended that [Student] be expelled for two years." (Decl. Parent ¶ 4, Doc. S-6.)
The committee found that Student's conduct was not a manifestation of his behavior because Student "planned and brought the weapon" on the bus. (Id.) The committee issued a notice of placement directing that Student be placed in a temporary hospital homebound program pending a second meeting to be held on October 31, 1996. (10/7/96 Notice of Placement, Admin.R., Ex. 6.)
*1247 At the second meeting, the committee met to decide whether Student should be placed in the OCSB's Alternative School. (Decl. Parent ¶ 5, Doc. S-6; Tr. Hr'g 3/31/98 at 94-95, Admin.R.) The committee decided to release Student from the hospital homebound program and place him in the OCSB's Alternative School beginning on November 5, 1996. (10/31/96 Notice of Placement, Admin.R., Ex. 7.)
From November 5, 1996 through March 6, 1997, Student attended the Alternative School. (Dep. Parent at 19-21, Doc. S-4.) During that time, Student attended school on 48 of the 50 school days, earned passing grades in all of his classes, and performed well in the school's behavioral management program. (Tr. Hr'g 3/31/98 at 53-54, Admin.R.)
On March 6, 1997, Student left the Alternative School to serve a sentence at the Adolescent Residential Center (ARC). (Id. at 70.) Student was obligated to do so because, on December 31, 1996, Student was found guilty in a juvenile court of aggravated battery with a deadly weapon based upon the October 1, 1996 slashing incident. (Order of Disposition, Admin.R., Ex. 28.) Student completed the ARC program in August of 1997. (Decl. Parent ¶ 7, Doc. S-6.)
On August 21, 1997, a committee met to determine where Student would attend school during the 1997-1998 school year. (Id.) Parent attended the meeting along with personnel from the ARC, the Alternative School, OHS, and the OCSB. (8/21/97 Notice of Placement, Admin.R., Ex. 10.)
At the meeting, the committee discussed several options for Student's placement. ARC staff reported that Student had undergone therapy at ARC that had improved his disposition, and they recommended giving Student a thirty day probationary period at OHS. (Id.) OHS staff said that Paradiso, who was not at the meeting, had recommended that Student continue to honor the "2 year recommended expulsion notice," and they expressed concern for the safety of Student and the other students if Student were to return to OHS. (Id.) Parent contends that, at the August 21 meeting, OHS personnel "kept saying that Mr. Paradiso had expelled [Student] until the end of the 1997-1998 school year and that he had to complete the expulsion period." (Id.) During the meeting, Cayasso, an OCSB employee, told Parent whom to contact at the OCSB office if Parent wanted "to argue the situation in front of the School Board." (Id.)
Parent became upset while at the meeting, and she and Student left the meeting early. (Id.; Decl. Parent ¶ 8, Doc. S-6.) Ultimately, the committee decided to place Student in the Alternative School. (8/21/97 Notice of Placement, Admin.R., Ex. 10.) The committee also scheduled a second meeting for September 9 to further discuss the issue.
Following the August 21, 1997 meeting, Parent contacted the OCSB and obtained a phone number for the Florida Department of Education. (Decl. Parent ¶ 10, Doc. S-6.) When Parent contacted the Department of Education, Parent learned of her rights under the IDEA including her right to request a due process hearing to challenge Student's placement. (Id.)
Another meeting was held on September 9, 1997. During the meeting, Parent allegedly complained about Student's placement because Parent wanted Student to attend OHS so that Student could play football. (Aff. Collins ¶ 3, Doc. 24, Ex. 3.) Paradiso, Collins, and several other school officials allegedly told Parent that Student would have to remain at the Alternative School through the end of the 1998 school year because he had been expelled. (Decl. Parent ¶ 11, Doc. S-6.)
Parent then requested a due process hearing. Parent contends that Collins attempted to dissuade Parent from requesting a due process hearing by telling Parent that it would take fifteen days to process the request and that the due process hearing would cause Parent to miss work. (Id. ¶ 12.)
*1248 On September 10, 1997, Collins forwarded Parent's written request for a due process hearing to the OCSB's counsel. (Aff. Collins ¶ 6, Doc. 24, Ex. 3.) On September 15, 1997, the OCSB's attorneys sent the request to the Clerk of the Florida Division of Administrative Hearings with a cover letter that requested a hearing as soon as possible and no later than October 24, 1997. (Id. ¶ 7.)
On September 19, 1997, Parent, at Collins' request, met with Paradiso, Collins, Cayasso, and Dr. Xavier Pinellas, a community advocate, to settle Parent's complaints and avoid a due process hearing. (Decl. Parent ¶ 13, Doc. S-6; Aff. Collins ¶ 8, Doc. 24, Ex. 3.) According to Collins, Parent expressed concerns that Student "would not be able to obtain a class ring, senior pictures, and a cap and gown and would not be able to participate in senior activities such as graduation, Disney's `Grad Nite,' and prom." (Aff. Collins ¶ 8, Doc. 24, Ex. 3.) The parties allegedly arrived at an agreement whereby Student could order a class ring and senior pictures and participate in graduation exercises but would not be allowed to attend Disney's "Grad Nite" or senior prom. (Id. ¶ 12.) In exchange, Parent agreed to withdraw her due process request.
Collins contends that Parent agreed to the settlement after consulting with Pinellas. (Id. ¶ 13.) Parent contends that she was tricked into abandoning her due process request because Cayasso told her that there could be no agreement unless Parent withdrew her due process request. (Decl. Parent ¶ 13, Doc. S-6.) Based upon Parent's withdrawal of her due process request, the State of Florida Division of Administrative Hearings entered an order on September 26, 1997 dismissing the proceeding and closing the case. (Order, Doc. 24, Ex. 3, Ex. C.)
On October 14, 1997, Parent renewed her request for a due process hearing. (Decl. Parent ¶ 14, Doc. S-6.) The OCSB's counsel again forwarded her request to the Clerk of the Florida Division of Administrative Hearings, and a hearing was scheduled for November 7, 1997. (Aff. Collins ¶ 19, Doc. 24, Ex. 3.) The hearing was later rescheduled for March 31, 1998 after Parent requested a continuance so that she could retain counsel. (Id. ¶ 21.)
At the March 31, 1998 hearing, the administrative court addressed whether Student's placement provided Student with a free appropriate public education (FAPE) as guaranteed under the IDEA. (Tr. Hr'g 3/31/98 at 3, Admin. R.) Parent proceeded without the benefit of counsel. (Id. at 4.) On August 3, 1998, the administrative law judge entered a final order finding that Student was receiving a FAPE at the Alternative School and directing that Student remain in his current placement. (8/3/98 Final Order ¶¶ 37-40, Admin. R.) On September 2, 1998, the plaintiffs brought the present action.

II. Discussion
In this case, the court is asked to review the state administrative court's decision finding that Student received a free appropriate public education (FAPE) and directing that Student remain in the Alternative School. Although the district court reviews the administrative court's decision de novo, the court must heed the Supreme Court's admonition that district courts should not substitute their "own notions of sound educational policy for those of the school authorities which they review." Board of Educ. v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); Doe v. Alabama State Dep't of Educ., 915 F.2d 651, 657 n. 3 (11th Cir.1990). After reviewing the summary, judgment standard, the court will first address the plaintiffs' IDEA claims against the OCSB and then the § 1983 claims against each of the defendants.

A. Summary Judgment Standard
Summary judgment is appropriate "if, after viewing the evidence in the light most favorable to the non-moving party, the court finds that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter *1249 of law." See Hauser v. Life Gen. Sec. Ins. Co., 56 F.3d 1330, 1333 (11th Cir.1995). After the moving party presents evidence sufficient to show that no genuine issue of material fact exists, the burden then shifts to the non-moving party to demonstrate that a material issue of fact exists to preclude summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

B. IDEA Claims
To determine whether a handicapped student received a FAPE, a court must consider whether a disabled student's IEP is reasonably calculated to enable the child to receive educational benefits, whether the student's placement allows the student to receive those benefits in the least restrictive environment, and whether the state complied with the IDEA's procedures. See Weiss v. School Bd., 141 F.3d 990, 994 (11th Cir.1998); Greer v. Rome City Sch. Dist., 950 F.2d 688, 696 (11th Cir.1991) (finding that any placement must be in the least restrictive environment), opinion withdrawn by 956 F.2d 1025 (11th Cir.1992), opinion reinstated in part by 967 F.2d 470 (11th Cir.1992). The plaintiffs raise arguments regarding each of these considerations.

1. Adequate Educational Benefits
Student's placement in the Alternative School was reasonably calculated to enable him to receive adequate educational benefits. Adequate educational benefits simply means a "basic floor of opportunity." JSK v. Hendry County Sch. Bd., 941 F.2d 1563, 1572-73 (11th Cir.1991). The Alternative School provided Student with a basic floor of opportunity because, although the Alternative School offered limited extra-curricular activities and did not offer Student a reading instructor certified to teach special education students, Student's behavior improved during his tenure at the Alternative School, and he progressed through the educational system earning passing grades in all of his courses, including reading. (Tr. Hr'g 3/31/98 at 53-54, 72, 81, Admin. R.; 8/3/98 Final Order ¶¶ 25-26, Admin. R.)

2. Least Restrictive Environment
Furthermore, Student's placement did not violate the IDEA's requirement that a disabled child be educated in the "least restrictive environment." To determine whether a disabled student has been placed within the least restrictive environment, a court must consider: "(1) the academic benefits of placement in a mainstream setting, with any supplementary aides and services that might be appropriate; (2) the non-academic benefits of mainstream placement, such as language and behavior models provided by non-disabled students; (3) the negative effects the student's presence may have on the teacher and other students; and (4) the cost of educating the student in a mainstream environment." Clyde K. v. Puyallup Sch. Dist., No. 3, 35 F.3d 1396, 1401-02 (9th Cir.1994). For example, courts have allowed removal where a student's disruptive behavior poses a danger to others. See id. (allowing removal where a student engaged in two violent attacks on other students, assault on a staff member, and disruption of class with profanity and sexually explicit remarks); School Bd. v. J.M., 957 F.Supp. 1252, 1254 (M.D.Fla.1997) (regular aggressive behavior).
The undisputed evidence shows that the Alternative School was the least restrictive environment for Student. The record shows that both OHS and the Alternative School offered comparable educational benefits to Student but that Student's inability to control his behavior made it impossible for Student to obtain those benefits at OHS without posing a threat of injury to teachers and other students. While Student attended OHS, Student engaged in repeated instances of aggressive behavior and violence including fighting, profanity, and disobedience. In contrast, Student's behavior improved at the Alternative School because of the Alternative School's small student population and behavioral *1250 management program. (Tr. Hr'g 3/31/98 at 53-54, 60-63, Admin.R.) Based upon this evidence, a reasonable jury could only conclude that Student could not receive educational benefits at OHS because of his inability to control his own behavior and that, therefore, the Alternative School was the least restrictive environment for Student. (8/3/98 Final Order ¶¶ 25-28, 40, Admin.R.)
The plaintiffs claim that Student should not have continued to be placed in the Alternative School for the 1997-1998 school year because Student's behavior had significantly improved following his detention in the juvenile justice program. In support, the plaintiffs point to the fact that, at the August 1997 meeting, the Alternative School's behavior analyst and Student's ARC teacher both recommended Student's return to OHS.
The plaintiffs' argument is unconvincing. Even if Student's behavior had improved significantly, the court will not substitute its own judgment for that of experienced educators simply because two of the committee members cast dissenting opinions. There is ample evidence to show that, while Student's behavior had improved at the Alternative School and at ARC, Student was still having difficulties controlling his behavior and would still be a danger to himself and others if placed at OHS. (Tr. Hr'g 3/31/98 at 71-72, 78, 87, Admin. R.; 8/3/98 Final Order ¶ 40, Admin. R.) Moreover, the Alternative School's behavior analyst later retracted her recommendation that Student be returned to OHS and instead recommended that he continue to be placed at the Alternative School because, when she originally made her recommendation at the August 1997 meeting, she did not have all of the information about Student's prior disciplinary problems at OHS. (Tr. Hr'g 3/31/98 at 85-86, Admin.R.)

3. Procedural Violations
The plaintiffs also seek recovery for several alleged violations of the IDEA's procedural provisions. A violation of the IDEA's procedural provisions is not a per se violation of the Act. To recover under the IDEA for violation of a procedural provision, a plaintiff "must show harm to [the student] as a result of the alleged procedural violations." Weiss, 141 F.3d at 996; see also Doe v. Alabama State Dept. of Ed., 915 F.2d 651, 660 (11th Cir.1990) (notice deficiencies did not violate the IDEA's predecessor, the Education of the Handicapped Act, where the parents had full and effective participation in the IEP process); Urban v. Jefferson County Sch. Dist. R-1, 89 F.3d 720, 726 (10th Cir.1996) (finding that technical deviations from the IDEA's requirements do not render an IEP invalid); Roland M. v. Concord Sch. Comm., 910 F.2d 983, 994 (1st Cir.1990) (same); Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 982 (4th Cir.1990) (finding that procedural faults did not result in a violation where the faults did not cause the child to lose any educational opportunities).
Here, the plaintiffs assert that the 1996 manifestation hearing was not conducted in accordance with the IDEA's provisions and that the plaintiffs were not afforded notice of their right to a due process hearing at the August 1997 meeting. The plaintiffs cannot recover for either of these alleged procedural violations because the alleged violations could not have caused the plaintiffs any harm.
The plaintiffs cannot have been harmed as a result of any alleged procedural violations during the manifestation hearing. As discussed above, the OCSB provided Student with adequate educational benefits in the least restrictive environment throughout the relevant time period. Moreover, Parent had full and effective participation in Student's educational process because the OCSB notified Parent of all of the relevant meetings and decisions regarding Student's education, and Parent actively participated in those meetings. Because Parent had full and effective participation and because the OCSB always provided Student with adequate educational benefits in the least restrictive environment, the plaintiffs did not suffer any *1251 harm as a result of the alleged procedural deficiencies during the manifestation hearing.
Furthermore, any notice deficiencies during the August 1997 meeting did not harm the plaintiffs. The IDEA requires that state agencies provide parents with written notice of their rights under the IDEA, including their right to a due process hearing, when the agency proposes or refuses to initiate or change the educational placement of a handicapped child. See 42 U.S.C. § 1415(b-d), (f)(1) (1990 & Supp.1998); Fla.Admin.Code Ann.R. 6A-6.03311. The plaintiffs could not have been harmed by any notice deficiencies at the August 1997 meeting because Parent learned of her right to a due process hearing only a week after the August 1997 meeting. The week-long delay is too minor to affect the plaintiffs' rights particularly given that, once a due process hearing was finally set, Parent caused the hearing to be delayed for several months.

C. § 1983 Claims
In addition to the IDEA claims, the plaintiffs bring claims against each of the defendants under 42 U.S.C. § 1983. Section 1983 creates a remedy for the deprivation of federal rights by authorizing suit against local governmental entities and public officials in their individual capacities. See 42 U.S.C.A. § 1983 (West 1994); Monroe v. Pape, 365 U.S. 167, 174, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). To state a claim under § 1983, a plaintiff must show (1) a deprivation of a protected right secured by the Constitution and laws of the United States, and (2) state action taken under color of law. See Gilmere v. City of Atlanta, 737 F.2d 894, 905 (11th Cir.1984). The plaintiffs' § 1983 claims fail against all of the defendants because the plaintiffs were not deprived of any federal rights, and the claims additionally fail against Paradiso and Collins because they are entitled to qualified immunity.

1. Paradiso and the OCSB
The plaintiffs assert that Paradiso and the OCSB deprived Student of his due process rights by expelling Student without notice and a hearing. These claims cannot succeed because Student was never expelled.
Under Florida law, expulsion "is the removal of the right and obligation of a student to attend a public school under conditions set by the school board, and for a period of time not to exceed the remainder of the term or school year and 1 additional year of attendance. Expulsions may be imposed with or without continuing educational services and shall be reported accordingly." Fla.Stat. ch. 228.041(26) (1997). The undisputed evidence shows that Osceola County provided Student with the right and obligation to attend school at all relevant times, and thus Student was never expelled from the school system.

2. Collins
The plaintiffs also assert that Collins deprived the plaintiffs of their rights under the IDEA by failing to inform the plaintiffs of their rights and by interfering with the plaintiffs' attempts to invoke their rights under the IDEA. Because the court previously found that any notice deficiencies at the August 1997 meeting did not harm the plaintiffs, the plaintiffs cannot recover against Collins for failing to give the plaintiffs notice of their right to a hearing.
As to the claim that Collins interfered with the plaintiffs' exercise of their rights, the record contains no evidence to support this claim. The plaintiffs claim that Collins interfered with the plaintiffs' rights by informing Parent that requesting a due process hearing would cause Parent to miss work and might take fifteen days to process. Collins' statements do not amount to a deprivation of federal rights because Collins merely told Parent the truth that a due process hearing could be a cumbersome process, which in fact turned out to be true for Parent.
*1252 The plaintiffs also claim that Collins violated the plaintiffs' rights by remaining silent when Cayasso told Parent that Parent must withdraw her due process request if Parent wanted to negotiate with the OCSB. Collins' inaction did not violate the plaintiffs' rights because the OCSB was not obligated to enter into informal negotiations with Parent.
Further, the plaintiffs contend that Collins unlawfully persuaded Parent to forego her right to a hearing by tricking Parent into agreeing to a settlement. This claim also fails because the evidence shows that Parent entered into the agreement knowing that she could later change her mind and request a due process hearing. When Parent became dissatisfied with the arrangement, she withdrew from the settlement agreement and again requested a due process hearing, which Collins and the OCSB helped Parent obtain by forwarding the request to the clerk of the administrative court. In sum, Collins cannot be held liable under § 1983 because Collins' actions never deprived Parent of any federal rights.

3. Qualified Immunity
The defense of qualified immunity further insulates Paradiso and Collins from the plaintiffs' § 1983 claims. Qualified immunity protects a government official from civil liability for damages arising from the performance of the official's discretionary functions. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The doctrine applies in all but the most exceptional circumstances. See Buckley v. Fitzsimmons, 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1322-24 (11th Cir.1989). To overcome the qualified immunity defense, a plaintiff must show that the official's "conduct violates a clearly established statutory or constitutional right of which a reasonable person would have known." Harlow, 457 U.S. at 818, 73 L.Ed.2d 396; Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149-51 (11th Cir.1994). The plaintiffs cannot point to any cases or statutes that would show that Paradiso's or Collins' actions violated any established law, and thus Collins and Paradiso are protected by qualified immunity.

III. Conclusion
Based upon the foregoing, the defendants' motions for summary judgment (docs. 24 and 48) are GRANTED. The court directs the clerk of court to enter the appropriate judgment and close the case.